446 B.R. 490 (2011)
In re QUVIS, INC. Debtor.
Douglas A. Friesen, M.D.; Marilyn R. Friesen Greenbush, Ph.D; Douglas C. Cusick; JFM Limited Partnership I; and the Unsecured Creditors' Committee, Plaintiffs
v.
Seacoast Capital Partners II, L.P., Defendant.
Bankruptcy No. 09-10706. Adversary No. 10-5142.
United States Bankruptcy Court, D. Kansas.
February 18, 2011.
*492 William B. Sorensen, Jr., Morris Laing Evans Brock and Kennedy, J. Michael Morris, Klenda Mitchell Austerman & Zuercher LLC, Wichita, KS, Luke P. Sinclair, Gay Riordan Fincher Munson & Sinclair PA, R. Patrick Riordan, Gary Riordan, Topeka, KS, for Plaintiffs.
J. Maxwell Tucker, Patton Boggs LLP, Dallas, TX, Thomas J. Lasater, Wichita, KS, for Defendant.

ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
ROBERT E. NUGENT, Chief Judge.
Plaintiffs assert a cause of action for equitable subordination against defendant Seacoast Capital Partners II, L.P. ("Seacoast") seeking to subordinate defendant's priority from a secured creditor of debtor QuVis, Inc. ("QuVis") to an unsecured creditor.[1] Plaintiffs allege that Seacoast engaged in inequitable or unfair conduct *493 by perfecting its security interest after the initial financing statement (UCC-1) filed by QuVis in 2002 lapsed, and without disclosing the lapse to other noteholder creditors, thereby jumping ahead in priority over most of the noteholder creditors.
Seacoast moves for summary judgment on the equitable subordination complaint.[2] Plaintiffs filed their memorandum in opposition[3] and Seacoast filed its reply,[4] and the Court took the motion under advisement.[5] The Court has reviewed the memoranda, affidavits, discovery and exhibits attached in support of the parties' memoranda and is prepared to rule. The Court has also reviewed its previous Order on Debtor's Motion to Determine Secured Status of Noteholders ("Noteholder Order") entered June 1, 2010 in the main case wherein the Court interpreted the primary loan and security Agreement under which some 70 parties became Noteholders.[6] The readers of the current Order are referred to the Noteholder Order for many of the facts pertaining to the financing of QuVis and the current parties' position in the financing arrangements.[7] The Court will refer to the Noteholder Order from time to time in this Order.

I. SUMMARY JUDGMENT STANDARDS
Federal Rule of Civil Procedure 56(c) directs the entry of summary judgment in favor of a party who "shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law."[8] This Court's function in reviewing a motion for summary judgment is to first determine whether genuine disputes as to material facts exist for trial. In making this determination, the Court may not weigh the evidence nor resolve fact issues.[9] The Court must construe the record in a light most favorable to the party opposing the summary judgment.[10]
Once the Court determines which facts are not in dispute, it must then determine whether those uncontroverted facts establish a sufficient legal basis upon which to grant movant judgment as a matter of *494 law.[11] If different ultimate inferences may properly be drawn from the facts, summary judgment is not appropriate.[12] On a motion for summary judgment, the movant does not need to prove a negative on an issue or element of a claim that the nonmoving party must prove at trial. The movant only needs to point to an absence of evidence on an essential element of the nonmovant's claim.[13]

II. UNCONTROVERTED FACTS
The Court finds the following facts submitted by Seacoast in its opening memorandum and the additional facts submitted by plaintiffs in their opposing memorandum are uncontroverted and material to the equitable subordination claim.
Seacoast is a Small Business Investment Company ("SBIC") licensed by the United States Small Business Administration under the Small Business Investment Act of 1958.[14] Eben S. Moulton ("Moulton") is the managing director of Seacoast.
In early 2005, Seacoast considered lending to or investing in QuVis and conducted due diligence in connection with a proposed purchase of promissory notes to be issued by QuVis. The terms of the notes to be purchased had been previously set out in the First Amended and Restated Convertible Loan and Security Agreement dated and effective June 30, 2003 ("2003 Agreement"), between each "Lender" (referred to here as Noteholder) and QuVis.[15] Neither Seacoast nor Moulton was involved in the negotiation of the 2003 Agreement. As provided for in the 2003 Agreement, QuVis filed a UCC-1 financing statement (the 2002 UCC-1) on March 14, 2002 on behalf of all of the Noteholders who had loaned money to QuVis.[16] As additional loans were made by new Noteholders, QuVis would file amendments to the 2002 UCC-1, adding the new Noteholders as secured parties to the 2002 UCC-1. Plaintiffs Friesen, Greenbush, *495 Cusick and JFM Limited Partnership I were all Noteholders under the 2003 Agreement whose security interests were secured by the 2002 UCC-1. Seacoast did not became a Noteholder until 2005.
On June 1, 2005, Seacoast loaned QuVis $3,160,066.40 and QuVis issued a promissory note in that amount to Seacoast.[17] Seacoast's note bore a maturity date of June 30, 2006. QuVis' board of directors passed a corporate resolution approving the note and transaction with Seacoast.[18] As part of the 2005 loan, QuVis and Seacoast entered into a Joinder Agreement[19] by which Seacoast became a "Lender" as set forth in the 2003 Agreement. Under the 2003 Agreement and the Joinder Agreement, Seacoast's loan commitment was predicated on QuVis granting Seacoast the same valid and perfected security interest in certain QuVis assets that the previous Noteholders had received. In June of 2005, Seacoast believed that the terms of the 2003 Agreement delegated to each Noteholder the contractual duty to share pro rata any collateral recoveries it might obtain with the other Noteholders.
Seacoast also believed that the security interest it received would be of co-equal priority with that of the other Noteholders. Otherwise, Seacoast would not have made the June 2005 loan to QuVis. It would not have accepted a lien that was subordinate to other Noteholders who had already filed their liens of record.[20] Proof that this was both parties' intention is found among the documents in the closing binder related to the June 2005 note. Among the documents is a "UCC Financing Statement Amendment" adding Seacoast as a secured party to the 2002 UCC-1. QuVis was supposed to file the amendment as it was required to do under the 2003 Agreement and as it had done on numerous previous occasions, even as late as May 27, 2005, for other Noteholders. For reasons unknown, QuVis never filed the financing statement amendment listing Seacoast as a secured party.[21]
On November 2, 2005, Seacoast loaned QuVis an additional $719,933.60 and received a note on the same date.[22] Seacoast did not file a UCC-1 financing statement or UCC-2 amendment contemporaneously with this loan.
Part of the deal Seacoast made with QuVis was that Seacoast would be permitted to name a director to the QuVis board. The Joinder Agreement between QuVis *496 and Seacoast provides, in relevant part, at ¶ 4.25:
... The Company [QuVis] will (a) permit New Lender [Seacoast] to designate one (1) person to attend all meetings of the [QuVis] board of directors ... (c) permit such designee to attend such meetings as an observer, (d) permit [Seacoast], so long as [Seacoast] holds a Note or owns any stock, warrants or other equity interest in [QuVis], to designate one (1) Person to serve as a member of [QuVis'] board of directors
...
On May 3, 2006, Moulton was elected to serve as an outside director to the board of QuVis. Moulton has served as an outside director on the boards of many of the small business companies to which Seacoast provided venture capital. Moulton's service on such boards is consistent with his understanding of the purposes of the Small Business Investment Act of 1958, under which licensed SBICs are expected to provide management support to the small business ventures in which they invest.
On March 14, 2007, the 2002 UCC-1 that had been filed by QuVis on March 14, 2002, lapsed by operation of law.[23] On the same day, Seacoast loaned QuVis an additional $350,000 and received a note of the same date.[24] Neither Seacoast nor QuVis filed a UCC-1 financing statement or UCC-2 amendment contemporaneously with this loan. Moulton believed that the March 2007 note was secured by a perfected lien, although Moulton took no steps at that time to verify the status of the lien. If Moulton had known of the lapse of the 2002 UCC-1 in March 2007, he would have required that the necessary perfecting records be filed before Seacoast made the March 2007 loan.
Moulton understood (and the 2003 Agreement provided) that upon maturity of the loans each Noteholder had the option of either exchanging its note for Qu-Vis stock under a formula set forth in the 2003 Agreement or receiving payment of its note in cash. In the months of March, April and May, 2007, Moulton participated as a board member of QuVis in exploring and locating a new funding source to retire the obligations of Noteholders who chose not to exchange their notes for QuVis stock. Moulton believed that the investment banking firm Pacific Crest Securities was a potential and viable source of funding. When it became clear that a Pacific Crest transaction could not be closed on or before the June 30, 2007 maturity date of the Noteholders' notes, the QuVis board decided to request an extension of the maturity dates from the Noteholders. On May 31, 2007 QuVis board member Owen Leonard circulated a draft letter for consideration by the QuVis board, proposing to request that Noteholders grant an extension of the maturity date ninety days to September 30, 2007. After Leonard's draft was edited and finalized by QuVis directors (including Moulton), QuVis transmitted the letter on June 7, 2007 to all Noteholders requesting that the maturity date of the notes be extended to September 30, 2007.[25]
*497 When Seacoast received the maturity extension letter, it requested its counsel, the same firm that represents it here, to review the same. Counsel obtained a UCC search report on or about June 8, 2007. Not surprisingly, the lapsed 2002 UCC-1 was not listed in the June report.[26] On June 14, 2007 Seacoast filed its own UCC-1 financing statement to perfect its security interest in QuVis assets.[27] Two other Noteholders, Greg Kite and The Christine Baugher Trust, had filed new UCC-1 financing statements on June 7, 2007, prior to Seacoast.[28] No other Noteholders filed UCC-1s in 2007.[29] Owen Leonard and Vernon Nelson, two other QuVis directors in 2007 who were also Noteholders, did not file new UCC-1s until January 16, 2009 and January 13, 2009 respectively.[30] The plaintiff Noteholders filed their UCC-1 financing statements in 2008.[31] This Court has previously concluded in the Noteholder Order that individual Noteholders were authorized to file financing statements under the 2003 Agreement and under the Uniform Commercial Code.[32] On June 22, 2007 Seacoast consented to the requested maturity extension of the notes to September 30, 2007.
Moulton resigned from the QuVis board of directors on September 26, 2008. He did not receive a director's fee or other compensation from QuVis for his service as a director. He never served as an officer or employee of QuVis. None of the minutes of the QuVis board meetings in 2007 reference the lapse of the 2002 UCC-1.
On March 20, 2009, plaintiffs Friesen, Greenbush, and Cusick commenced this involuntary chapter 11 case as petitioning creditors. QuVis consented to an order for relief being entered on May 18, 2009. In its Disclosure Statement and Plan dated November 6, 2009, QuVis proposed to classify all of the Noteholders under the 2003 Agreement in the same class and be treated identically, as secured creditors of coequal priority with pro-rata interests in the debtor's assets. Significantly, Seacoast supported QuVis position that all of the Noteholders' liens were perfected by the filing of a UCC-1 by any one Noteholder, a position that served the interests of the plaintiff Noteholders. At the disclosure statement hearing, the Court concluded that the proposed classification of the Noteholders as creditors might not reflect the actual legal relationship between and among them.[33] After the debtor filed its motion to determine the Noteholders' respective secured status, this Court conducted an evidentiary hearing on March 17, 2010 and issued its Noteholder Order on June 1, 2010.
In the Noteholder Order, the Court rejected the debtor's and Seacoast's position, concluding that no language in the 2003 Agreement authorized or appointed the Noteholders to file financing statements or perfect security interests for one another, and that the Noteholders who filed UCC-1s after the lapse of the 2002 financing statement were perfected individually and were accordingly entitled to payment in *498 the order in which they filed their financing statements, not pro-rata.[34] After this ruling, plaintiffs commenced this adversary proceeding against Seacoast on July 20, 2010, contending that Seacoast's secured claim should be equitably subordinated to an unsecured claim. The plaintiffs assert that by virtue of Moulton's seat on the QuVis board, Seacoast allowed the 2002 UCC-1 to lapse, that Seacoast knew or should have known of the lapse of the 2002 UCC-1, and that Seacoast was duty-bound to advise its fellow Noteholders of the lapse. The plaintiffs assert that Seacoast acted inequitably when it individually filed a new UCC-1 on June 14, 2007 and this conduct was to the detriment of the other Noteholders. Finally, the plaintiffs urge that Seacoast gained this opportunistic priority by reason of its insider and fiduciary status.[35]
The only material fact disputed by the parties is whether Seacoast knew that the 2002 UCC-1 had lapsed when it filed its new UCC-1 on June 14, 2007. For its part, Seacoast contends that it did not discover until June of 2007 that it had never been added as a secured party to the original 2002 UCC-1 as it originally contemplated when it made the first loan in 2005. Its response was to file a new UCC-1 on June 14, 2007. Plaintiffs contend that Seacoast knew or must have known of the lapse by virtue of Moulton's presence on the QuVis board, arguing that had Seacoast not known of the lapse, it would have filed an UCC-2 amendment to the original 2002 UCC-1 that added Seacoast as a secured party, rather than a new UCC-1. In addition, plaintiffs submit that the fact that the original 2002 UCC-1 was not included in Seacoast's June 2007 UCC search report requires the Court to infer that Seacoast knew that the financing statement had lapsed. For purposes of determining this motion for summary judgment, the Court construes the facts in a light most favorable to the non-moving plaintiffs and infers that Seacoast knew that the original 2002 UCC-1 had lapsed when it filed the new UCC-1 on June 14, 2007. As explained below, however, this fact does not preclude entry of summary judgment in favor of Seacoast.

III. ANALYSIS AND CONCLUSIONS OF LAW

A. The Doctrine of Equitable Subordination

11 U.S.C. § 510(c) provides, in pertinent part:
Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may
(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim ... [36]
Tenth Circuit equitable subordination case law requires that three elements be established by the plaintiffs: (1) that the claimant [Seacoast] has engaged in some type of inequitable conduct; (2) that the misconduct has resulted in injury to the creditors or conferred an unfair advantage on Seacoast; and (3) that subordination of Seacoast's claim would not be inconsistent with the provisions of the *499 Bankruptcy Code.[37] Our Circuit has identified inequitable conduct as "the critical inquiry."[38] Focusing on this element determines the plaintiffs' equitable subordination claim.[39]
In In re Hedged-Investments Assoc., Inc.,[40] the Tenth Circuit identified three categories of misconduct: (1) fraud, illegality, and breach of fiduciary duties; (2) undercapitalization; or (3) claimant's [Seacoast's] use of the debtor as a mere instrumentality or alter ego.[41] The plaintiffs assert only the first category of misconduct and do not specifically allege that Seacoast engaged in any illegality or fraud. Instead, the plaintiffs charge that Seacoast's conduct was "inequitable" and that Seacoast was an insider or occupied a fiduciary position. Seacoast's position vis a vis the debtor and the other creditors is the principal inquiry under the principles of the Hedged-Investments case because an insider's or fiduciary's conduct need only be "unfair" and "culpable" to support an equitable subordination claim:
... this Circuit has joined other Courts of Appeals in applying different levels of scrutiny to "insiders" and "non-insiders" of the debtor corporation. See In re Castletons, 990 F.2d at 559. Where the claimant is an insider or a fiduciary, the party seeking subordination need only show some unfair conduct, and a degree of culpability, on the part of the insider, [citations omitted]. If the claimant is not an insider or a fiduciary, however, the party seeking subordination must "demonstrate even more egregious conduct such as gross misconduct tantamount to fraud, misrepresentation, overreaching or spoliation." In re Castletons, 990 F.2d at 559.[42]
Thus, we first address whether Seacoast was an insider of QuVis or stood in a fiduciary relationship to the plaintiffs before examining the nature of Seacoast's conduct. If Seacoast was an insider or fiduciary, the plaintiffs need only show that Seacoast engaged in "unfair conduct" and has some "degree of culpability" to establish the misconduct prong of their equitable subordination claim. But if Seacoast is neither an insider nor a fiduciary, the plaintiffs are subject to the heightened scrutiny standard and must show more egregious misconduct on the part of Seacoast to justify equitably subordinating Seacoast's secured claim.

B. Is Seacoast an Insider of QuVis?

1. Moulton was a Statutory Insider under the Bankruptcy Code
The Bankruptcy Code includes as "insiders," directors of corporate debtors[43] Seacoast's managing director, Eben Moulton, served as a director of QuVis and was a statutory insider during the period the 2002 UCC-1 lapsed on March 14, 2007 and Seacoast filed its UCC-1 on June 14, 2007.

2. Imputing Moulton's Insiderness to Seacoast
The plaintiffs assert that because Moulton was Seacoast's "representative" on the QuVis board and an insider, Seacoast *500 must also be an insider.[44] The Court disagrees. The Joinder Agreement gives Seacoast a right to "designate" a director to the QuVis board, but nothing in the Joinder Agreement gives Seacoast any special powers with respect to QuVis and nowhere does it provide that by making such a designation, Seacoast itself is deemed to be a director.[45] Nor does the Joinder Agreement give Seacoast or its designated director any greater power or authority than any other director on the QuVis board. In fact, many of Seacoast's rights under the Joinder Agreement were already available to the prior Noteholders under the 2003 Agreement.[46] For example, all Noteholders were granted (1) the right of access to QuVis' properties, facilities, employees, officers and collateral; (2) the right to inspect, audit and copy QuVis' books and records; and (3) the right to inspect, evaluate and verify collateral for their loans.[47] In short, the Joinder Agreement made Seacoast a "Lender" with rights and powers equal to those of the other Noteholders under the 2003 Agreement.[48]
The plaintiffs argue that because Moulton was Seacoast's managing director while acting as a director of QuVis, Seacoast was a "de facto" director of QuVis and therefore, an insider. The Tenth Circuit has rejected the plaintiffs' "de facto" director argument in similar circumstances.[49] In In re U.S. Medical, Inc., the creditor had the right to appoint a member of debtor's board under its stock purchase agreement with debtor.[50] The Tenth Circuit held that where a creditor's designated board member did not exercise control or undue influence over the debtor and the creditor's transactions with debtor were conducted at arm's length, the creditor could not be regarded as a de facto director or an insider. The U.S. Medical court suggested that only where the director took steps to enrich the creditor might that creditor be deemed a "de facto" director.[51]
The uncontroverted facts simply do not suggest that Moulton exercised any degree of control or influence over the debtor or that he forced it to allow the 2002 UCC-1 to lapse. Indeed, there is no evidence in the summary judgment record that the QuVis board addressed continuing the 2002 UCC-1 or allowing it to lapse in 2007. The Court cannot infer that Seacoast or Moulton influenced or encouraged QuVis to allow the lapse. Nor were Seacoast's transactions with QuVis at other than arms-length. Seacoast first became a *501 creditor of QuVis in 2005, contemporaneously with the execution of the Joinder Agreement. Seacoast received two of the three notes in 2005, for all but $350,000 of the principal indebtedness QuVis owed it. The notes and Joinder Agreement contemplated that Seacoast, as a new lender, would become a Noteholder under the 2003 Agreement and be afforded the same rights and duties as the existing lenders and Noteholders. The Joinder Agreement was executed and the notes were issued prior to Moulton becoming a member of the QuVis board in 2006. Nothing in the record on summary judgment suggests that these transactions were anything other than at arm's length.
Seacoast was not a statutory insider under 11 U.S.C. § 101(31)(B)(iii) as a "person in control of the debtor."[52] The uncontroverted facts do not even suggest, far less demonstrate, that Seacoast was "in control" of QuVis.[53] At most, Seacoast had a voice and a single vote in the governance of QuVis affairs by virtue of Moulton's seat on the board of directors and was one of QuVis' many lenders. This falls far short of establishing that Seacoast was in control of QuVis. The Court now turns to whether Seacoast is a non-statutory insider.

3. Seacoast as a Non-statutory Insider under Common Law
The definition of "insider" in § 101(31) is inclusive and not exclusive. Persons who do not precisely fit into the categories enumerated in that section may still be "non-statutory" insiders. In the U.S. Medical, Inc. case, the Tenth Circuit recently addressed non-statutory-insider status.[54] In that case, under the parties' distributorship agreement and stock purchase agreement, a director of the creditor corporation also sat on debtor's board. The creditor was given the right to designate that director. The creditor also held 10.6 percent of debtor's stock. The trustee argued that these circumstances rendered the creditor a non-statutory insider for the purposes of determining whether the 90-day or one-year look-back applied in his preference case.[55] The Tenth Circuit held that the creditor could not be regarded as a non-statutory insider based solely on the closeness of the debtor's and creditor's relationship without more:[56]
... a closeness-alone test would create a "de facto director," per se rule. Such a rule would force corporations to find directors from companies with which they do no business and would impermissibly create a new category of insider not determined within the context of "particular cases, based on the specific facts." [citation omitted]. This approach does not comport with the intent of Congress nor the case law ... [57]
Again, to be an insider, the creditor's transactions with the debtor must be at less than arm's length.[58] Courts also consider *502 whether the creditor had access to inside information and used the information to enrich itself.[59] Under the facts in U.S. Medical, the Tenth Circuit held that the creditor was not a non-statutory insider.
Applying this analysis to the uncontroverted facts in this case, and bearing in mind the summary judgment standards governing this analysis, the Court concludes that QuVis and Seacoast were even more distanced from one another than the parties in U.S. Medical. The creditor in U.S. Medical had an exclusive distributorship agreement with debtor, was the sole manufacturer of debtor's product, had the right to designate a director on debtor's board, and held a 10 per cent stock ownership interest in the debtor. By contrast, Seacoast owned no equity in the debtor. Seacoast was one of QuVis's many secured creditors, subject to the terms of the same 2003 Agreement as were all of the other Noteholders. The 2003 Agreement gave all of the Noteholders access to the books and records of the debtor. The Noteholders had the right to file a financing statement to perfect their security interests should the debtor fail to make the requisite UCC filings.[60] There is no evidence that Seacoast obtained any uniquely available insider information by virtue of Moulton's seat on the board. The lapse of the 2002 UCC-1 was not mentioned in the 2007 board minutes. The 2002 UCC-1 was a matter of public record filed in the Secretary of State's office. Any of the Noteholders could have ascertained its lapse by performing a simple UCC records search as several of them clearly did.[61]
Were Seacoast's transactions with the debtor done at arms length? The Court has already concluded that the lending transactions were. The remaining challenged transaction is Seacoast's filing of the new UCC-1 on June 14, 2007 to perfect its security interest. Seacoast's right to file a financing statement is well-founded in the 2003 Agreement and the 2005 Joinder Agreement. Both these agreements were executed well prior to Moulton ever joining the QuVis board of directors. The terms of the 2003 Agreement delegated to QuVis the responsibility to make the requisite filings to perfect or continue the security interest and authorized each Noteholder to perfect its security interest if the debtor failed to do so. The only other "transaction" between QuVis and Seacoast pertains to the letter request for a 90 day extension of the maturity on all the Noteholders' notes. That request was drafted and sent to all Noteholders (with Moulton's, Seacoast's and Quvis' approval) in late May or early June, after the March 14, 2007 lapse of the 2002 UCC-1. Seacoast consented to the extension request. There are no uncontroverted facts from which this Court may reasonably infer that QuVis and Seacoast colluded in some fashion to either permit or to conceal the lapse of the 2002 UCC-1.
As noted in the findings of uncontroverted fact, there is a dispute about the lapse of the 2002 UCC-1. The record is uncontroverted that the lapse occurred on March 14, 2007. What is less clear is what Seacoast knew about the lapse and when it knew it. Debtor's corporate counsel Kathleen Urbom testified that well after the lapse, in June or July, director Owen *503 Leonard consulted her about whether QuVis or the Board had incurred some liability by QuVis' having suffered the lapse to occur. Despite being repeatedly asked leading questions that posited a scenario where Moulton discussed or considered prior to March 14, 2007 allowing the statement to lapse, Urbom testified that she never discussed the lapse with Moulton at all. Urbom had concluded that the debtor had no duty to continue the filing, but consulted with her outside counsel at Kutak Rock about potential director liability to creditors should the corporation become insolvent. According to Seacoast's interrogatory answers, Moulton thought that Patton Boggs, then as now Seacoast's counsel, had provided for Seacoast at a minimum to be protected as to its second and third notes sometime in June of 2007. These answers also suggest that Moulton did not learn of the lapse until after the involuntary petition was filed in this case, in October of 2009. Seacoast's Answer filed in this case says that "upon learning QuVIS failed to accomplish the filing of an effective Financing Statement listing Seacoast as a secured party back at the inception of the loan transaction in May 2005, Seacoast promptly exercised its contractual rights under the Note Agreement and its rights under Kansas law to file a financing statement, and Seacoast admits such filing was made on June 14, 2007." While this suggests that Seacoast knew of the lapse no later than June 14, 2007, it does not suggest that Seacoast or Moulton orchestrated the lapse with QuVis. Seacoast was entitled to file a financing statement under the 2003 Agreement and it did so. Nothing in the record suggests that it did so with intentions beyond perfecting its security interest.[62] Nor does the record suggest that Seacoast or Moulton misled plaintiffs or other Noteholders with respect to the lapse. Indeed, under the terms of the 2003 Agreement, Seacoast had no responsibility to plaintiffs or other note creditors as a result of exercising its right to file its financing statement.[63] To the extent this constitutes a "transaction," because the transaction was clearly contemplated in the parties' agreement, the Court concludes that it is at arm's length.
The Court concludes that, on this record, Seacoast was not a non-statutory insider of the debtor.

C. Seacoast's Fiduciary Status

If Seacoast stood in a fiduciary relationship with the other Noteholders, the plaintiffs would only need to show that it engaged in "unfair conduct" to support their claim. The same "unfairness" standard that applies to insiders will apply if Seacoast is a fiduciary. As between Seacoast and QuVis, the parties occupied nothing more than a debtor-creditor relationship.[64] Moulton owed no fiduciary duty to the plaintiffs; as a director, his fiduciary duties were to the shareholders *504 of QuVis, not QuVis' creditors.[65] As noted above, Seacoast was not a "de facto director" by virtue of Moulton's seat on the QuVis board. Seacoast owed no fiduciary duty to plaintiffs or QuVis' creditors.[66]
Nor did Seacoast owe any duties, contractual or otherwise, to the other Noteholders. The 2003 Agreement expressly absolves a Noteholder who exercises its rights to perfect its security interest from any liability to other Noteholders. Section 6.05 provides: "No Lender shall have any liability whatsoever to the Borrower, any other Lender or any third party for any action taken or rights exercised pursuant to this section."
The Court concludes as a matter of law that Seacoast owed no fiduciary duty to the plaintiffs or other Noteholders. Even if Seacoast knew that the 2002 UCC-1 had lapsed in March 2007 or when it filed its UCC-1 in June 2007, it owed no duty to disclose the lapse to plaintiffs or QuVis' creditors.

D. Did Seacoast Engage in Egregious or Gross Misconduct Tantamount to Fraud, Illegality, or Overreaching?

As Seacoast was neither an insider nor a fiduciary, the plaintiffs must demonstrate that Seacoast engaged in inequitable conduct to establish an equitable subordination claim. That heightened level of misconduct requires a showing of egregious, gross misconduct characterized by fraud, misrepresentation, or overreaching.[67] That is a difficult standard to meet and the plaintiffs have not met it here.[68]
The plaintiffs' alleged "egregious, gross misconduct" on the part of Seacoast is that it failed to disclose the lapse of the 2002 UCC-1 and it filed a new UCC-1 on its own behalf to individually perfect its security interest in QuVis assets. As noted, Seacoast owed no duty to disclose the lapse of the 2002 UCC-1 to plaintiffs or any other creditors of QuVis. There are no facts from which this Court could infer that Seacoast influenced or colluded with QuVis to permit the 2002 filing to lapse. Nor is there any evidence that Seacoast engaged in any fraud, misrepresentation, or overreaching with regard to the status of the 2002 UCC-1 or its lapse.
With respect to Seacoast's filing of a new UCC-1 on June 14, 2007, it protected its rights, as did nearly fifty other Noteholders who, acting independently of Seacoast, filed their own UCC-1.[69] It did so after Noteholders J. Greg Kite and The Baugher Revocable Living Trust took the same action. Seacoast has no liability to plaintiffs or other Noteholders by virtue of exercising its rights as a secured creditor, as it was authorized to do under the 2003 Agreement and by the UCC.[70] Some evidence *505 of misconduct or inequitable conduct is a necessary predicate to equitable subordination.[71] That evidence simply is not in this record. As did the creditor in this Court's prior Sunbelt case,[72] Seacoast took actions it was entitled to take as a secured creditor. That is not inequitable.[73] Seacoast had no duty to "warn" its fellow Noteholders of its action. Its filing was a matter of public record. Seacoast was not even the first Noteholder to recognize and capitalize upon this situation. The evidentiary record here is devoid of any inference or suggestion of a scheme or device by Seacoast directed at placing itself at an advantage vis-a-vis the other secured Noteholders. Indeed, Seacoast attempted to defend the Noteholders as a collective body when it strenuously argued before this Court for pro-rata treatment on the motion to determine secured status of Noteholders[74] and in support of the debtor's single classification of the Noteholder group in its Plan. Seacoast argued strenuously that the 2003 Agreement provided for all the holders to be pro-rata participants in the QuVis assets, a position this Court did not sustain. Seacoast supported QuVis's first attempt at a plan in this case, a plan that championed that arrangement.
The uncontroverted facts do not show any inequitable conduct, let alone any "egregious, gross misconduct" on the part of Seacoast. Nothing in this record points to misconduct tantamount to fraud or overreaching on Seacoast's part. Nor was Seacoast's conduct "unfair." Giving plaintiffs the benefit of all reasonable inferences, there simply is no triable issue presented here. Because the plaintiffs have supplied no record that would support a finding of inequitable conduct on the part of Seacoast, they cannot establish an essential element of their equitable subordination claim. Defendant Seacoast is therefore entitled to judgment as a matter of law and its motion for summary judgment is therefore GRANTED. A Judgment on Decision will issue this date.

JUDGMENT ON DECISION
Plaintiffs assert a cause of action for equitable subordination against defendant Seacoast Capital Partners II, L.P. seeking to subordinate defendant's priority from a secured creditor of debtor QuVis, Inc. to an unsecured creditor. Finding that there are no genuine disputes of material fact and giving plaintiffs all reasonable inferences to be drawn from the uncontroverted facts, the Court concludes that the uncontroverted facts entitle defendant to judgment as a matter of law, and grants defendant's motion for summary judgment.
*506 Based upon the summary judgment record, the Court concludes that defendant was neither an insider of the debtor nor a fiduciary to the plaintiffs. Plaintiffs have come forward with no evidentiary record that would support a conclusion that defendant engaged in gross misconduct tantamount to fraud or overreaching. Defendant owed no duty to prevent the lapse of a 2002 financing statement filed by debtor to perfect various lenders' and noteholders' security interests in debtor's assets and owed no duty to disclose the lapse upon its occurrence. Defendant was authorized by its loan agreement and the Uniform Commercial Code to file its own UCC-1 financing statement to perfect its security interest in debtor's assets upon the lapse of the 2002 financing statement. Because plaintiffs have failed to produce evidence of defendant's inequitable conductan essential element of their equitable subordination claim, defendant is entitled to judgment as a matter of law.
Judgment is hereby entered in favor of defendant on the plaintiffs' adversary complaint for equitable subordination.
SO ORDERED.
NOTES
[1] 11 U.S.C. § 510(c).
[2] Dkt. 54, 55, and 56.
[3] Dkt. 63
[4] Dkt. 64
[5] Plaintiffs Friesen, Greenbush and Cusick appear by their attorneys William B. Sorensen, Jr. and Ryan Peck. Plaintiff JFM Limited Partnership I appears by its attorneys Patrick Riordan and Luke Sinclair. The Committee appears by its attorney J. Michael Morris. Defendant Seacoast appears by its attorneys J. Maxwell Tucker and Thomas Lasater.
[6] No. 09-10706, Dkt. 332 ("Noteholder Order").
[7] All of the parties in the current controversy save the Unsecured Creditors Committee, are "Noteholders" under the First Amended and Restated Convertible Loan and Security Agreement dated June 30, 2003 whereby the Noteholders loaned at various times, various sums of money to QuVis in exchange for a security interest in QuVis assets.
[8] Fed.R.Civ.P. 56(a). Before December 1, 2010, Rule 56 provided that summary judgment should be rendered if there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56 is made applicable to adversary proceedings by Fed. R. Bankr.P. 7056.
[9] First Sec. Bank of New Mexico, N.A. v. Pan American Bank, 215 F.3d 1147, 1154 (10th Cir.2000) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Concrete Works of Colo., Inc. v. City and County of Denver, 36 F.3d 1513, 1518 (10th Cir. 1994)) (Court may not resolve disputed questions of fact at the summary judgment stage).
[10] McKibben v. Chubb, 840 F.2d 1525, 1528 (10th Cir.1988) (citation omitted).
[11] E.E. O.C. v. Lady Baltimore Foods, Inc., 643 F.Supp. 406, 407 (D.Kan. 1986) (Even if there are no genuine issue of material fact, the movant still has the burden to show it is entitled to judgment as a matter of law.); Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir.1998) (If there are no genuine issues of material fact, the district court must determine whether the substantive law entitles the movant to judgment).
[12] Security Nat. Bank v. Belleville Livestock Commission Co., 619 F.2d 840, 847 (10th Cir.1979).
[13] In re Sunbelt Grain WKS, LLC, 427 B.R. 896, 908 (D.Kan.2010) (granting summary judgment to defendant on equitable subordination claim, citing Trainor v. Apollo Metal Specialties, Inc., 318 F.3d 976 (10th Cir. 2002)). See also Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670-71 (10th Cir.1998) (On motion for summary judgment, if a party that would bear the burden of persuasion at trial fails to come forward with sufficient evidence on an essential element of its claim, all issues concerning all other elements of the claim become immaterial. A summary judgment movant may show entitlement to judgment as a matter of law simply by pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim.).
[14] See 15 U.S.C. § 661 et seq., Small Business Investment Act of 1958. The Act permits licensed SBICs to assist in providing capital and managerial support to small entrepreneurial business. The Act and SBICs are administered by the Small Business Administration ("SBA"). The federal regulations governing SBICs are found at 13 C.F.R. Part 107.20 et seq.
[15] Seacoast Ex. 7.
[16] The 2003 Agreement delegated to QuVis to file and maintain current any necessary records to perfect the Lenders' security interests. Id. at § 6.01(b). The 2003 Agreement also designated Noteholders as QuVis' attorneys in fact, permitting Noteholders to exercise these rights QuVis could exercise under the 2003 Agreement. Id. at § 6.05.
[17] Seacoast Ex. 3.
[18] The five-member Board at that time was comprised of William Gary Baker, Kenbe Goertzen, Owen Leonard, Becky Lester, and Vernon Nelson.
[19] Seacoast Ex. 2.
[20] In addition to the Joinder Agreement, Seacoast entered into a Subordination Agreement with Owen Leonard and Vernon Nelson on June 1, 2005 whereby Leonard and Nelson subordinated their notes owed by QuVis to Seacoast's notes. Leonard and Nelson were majority interest Noteholders and QuVis board members at the time of the Subordination Agreement. The Subordination Agreement was entered into "to induce New Lender [Seacoast] to enter into the Loan Agreement." Plaintiffs' Ex. C, Dkt. 63, pp. 44-49.
[21] This Court has previously concluded that Seacoast was never perfected in the 2002 financing statement. Noteholder Order, p. 22, n. 67.
[22] Seacoast Ex. 5. The Court observes that the supporting exhibit attached by Seacoast is a "replacement note," dated June 15, 2007 and bearing a maturity date of June 30, 2007. As the replacement note states, the funds had already been disbursed to QuVis and the "replacement note" amends and restates the indebtedness evidenced by the original November 2, 2005 note.
[23] See KAN. STAT. ANN. § 84-9-515 (2009 Supp.); Noteholder Order, p. 4.
[24] Seacoast Ex. 6. The Court observes that the supporting exhibit attached by Seacoast is a "replacement note," dated June 15, 2007 and bearing a maturity date of June 30, 2007. As the replacement note states, the funds had already been disbursed to QuVis and the "replacement note" amends and restates the indebtedness evidenced by the March 14, 2007 note.
[25] See e.g., Seacoast Ex. 51. The extension request letter made no mention that the 2002 UCC-1 had lapsed.
[26] Seacoast Ex. 52.
[27] Seacoast Ex. 4.
[28] Seacoast Ex. 53.
[29] Id.
[30] Id.
[31] Id.
[32] See Noteholder Order, pp. 10-16; KAN. STAT. ANN. § 84-9-509 (2009 Supp.) and 2003 Agreement, Seacoast Ex. 7, § 6.01(b) and § 6.05.
[33] Only creditors whose interests are "substantially similar" may be classified together. See § 1122(a).
[34] Noteholder Order.
[35] Dkt. 60 and Dkt. 376 (Case No. 09-10706).
[36] See Sender v. The Bronze Group (In re Hedged-Investments Assoc., Inc.) 380 F.3d 1292, 1297 (10th Cir.2004) (Under the doctrine of equitable subordination, courts seek to remedy some inequity or unfairness perpetrated against the bankrupt debtor's other creditors by postponing the subordinated creditor's right to repayment until others' claims have been satisfied.)
[37] Sloan v. Zions First Nat'l Bank (In re Castletons), 990 F.2d 551, 559 (10th Cir. 1993).
[38] Id.
[39] Because of this Court's determination on the inequitable conduct prong, it does not reach the remaining two elements.
[40] Sender v. The Bronze Group (In re Hedged-Investments Assoc., Inc.) 380 F.3d 1292 (10th Cir.2004)
[41] Id. at 1301.
[42] 380 F.3d at 1301-02 (emphasis added).
[43] 11 U.S.C. § 101(31)(B)(i).
[44] Recall that Moulton was a director of both Seacoast and of QuVis.
[45] As noted in Hedged-Investments, supra at 1303: "In any event, there is nothing inherently inequitable about negotiating a creditor relationship with a debtor as a condition of providing funds to the debtor."
[46] See Seacoast Ex. 2, Joinder Agreement, Sections 4.12 and 4.16 (access to audit and financial reports); 4.22 (right to inspect properties and books and records); 4.25 (right to board meeting minutes and records).
[47] See Seacoast Ex. 7, 2003 Agreement, Section 2.04
[48] See Seacoast Ex. 2, Recitals and Section 6.1.
[49] See In re U.S. Medical, Inc., 531 F.3d 1272, 1281-82 (10th Cir.2008) (for determining insider status in the preference context, chapter 7 trustee argued that creditor was a de facto director of debtor because creditor's CEO was on debtor's board).
[50] Id.
[51] Id. at 1282, citing In re Papercraft Corp., 187 B.R. 486, 494 (Bankr.W.D.Pa.1995), rev'd 211 B.R. 813 (W.D.Pa.1997), aff'd Citicorp Venture Capital, Ltd. v. Comm. Of Creditors Holding Unsecured Claims, 160 F.3d 982 (3rd Cir.1998).
[52] A "person" includes an individual, partnership and corporation under the Bankruptcy Code. 11 U.S.C. § 101(41).
[53] See 13 C.F.R. § 107.865. Under this regulation governing SBICs, Seacoast may exercise control over QuVis by majority representation on the board of directors. That clearly was not the case, even if Seacoast is deemed to be a director of QuVis by virtue of designating Moulton as a director on the QuVis board.
[54] The non-statutory insider status in the context of U.S. Medical, supra, was pertinent to determine whether the extended look back period applied to preference payments made to a creditor and sought to be avoided by the chapter 7 trustee.
[55] See § 547(b)(4)(a) and (B).
[56] In re U.S. Medical, Inc., 531 F.3d at 1278.
[57] Id. at 1282.
[58] Id. at 1280 ("We hold here that a creditor may only be a non-statutory insider of a debtor when the creditor's transaction of business with the debtor is not at arm's length.")
[59] Id. at 1280-81.
[60] See Noteholder Order, p. 11.
[61] It is just as likely that noteholders Greg Kite and Baugher Trust, who filed new UCC-1s prior to Seacoast, discovered the lapse when the letter request for a maturity extension was sent to the Noteholders, prompting them to check the status of their lien.
[62] The plaintiffs' argument that Seacoast's filing of a new UCC-1 financing statement instead of a UCC-2 amendment demonstrates its ill-intent ignores the fact that, on June 14, 2007, there was no longer a financing statement to amend.
[63] Seacoast Ex. 7, Section 6.05 provides: "No Lender shall have any liability whatsoever to the Borrower, any other Lender or any third party for any action taken or rights exercised pursuant to this section."
[64] See Seacoast Ex. 7, Section 12.14: "... it being understood and agreed that no provision contained herein [the Note Agreement] shall be deemed to create any relationship between the parties hereto other than the relationship of borrower and lender." See also Daniels v. Army Nat. Bank, 249 Kan. 654, 822 P.2d 39 (1991) (lender-borrower relationship creates debtor-creditor relationship, not fiduciary relationship)
[65] See Becker v. Knoll, 291 Kan. 204, 239 P.3d 830 (2010) (Director of a corporation owes high fiduciary duty to the stockholders of the corporation.); Speer v. Dighton Grain, Inc., 229 Kan. 272, 624 P.2d 952 (1981) (Directors of corporation owe duties to corporation and its shareholders).
[66] Carter-Waters Oklahoma, Inc. v. Bank One Trust Company, N.A. (In re Eufaula Industrial Authority), 266 B.R. 483, 489 (10th Cir. BAP 2001) (A non-insider creditor generally owes no fiduciary or contractual duty to the other creditors of a debtor and must be found to have engaged in some conduct giving rise to a legally recognized duty to other creditors before its claim will be equitably subordinated.)
[67] See Section III.A, infra at pp. 12-14.
[68] See In re Eufaula Industrial Authority, supra at 489 (noting that successful equitable subordination claims are "few and far between" in cases involving non-insiders or non-fiduciaries).
[69] See Seacoast Ex. 53.
[70] See Seacoast Ex. 7, §§ 6.01(b) and 6.05; KAN. STAT. ANN. § 84-9-509 (2009 Supp.); See also, Noteholder Order, Dkt. 332 at pp. 9-12, 14-16.
[71] The doctrine of equitable subordination looks to the behavior of the parties involved. In re Hedged-Investments Associates, Inc., supra.
[72] See Speth v. Whitham Farms Feedyard, L.P. (In re Sunbelt Grain WKS, LLC), 406 B.R. 918 (Bankr.D.Kan.2009), aff'd 427 B.R. 896 (D.Kan.2010) (Secured lender of debtor swept $1.6 million in funds from debtor's accounts as it was permitted to do under its loan documents with debtor and applied it to pay down debtor's line of credit. Even though the sweep was detrimental to other creditors and came on the heels of a grain prepayment to debtor, it did not constitute inequitable conduct sufficient to support equitable subordination.)
[73] On appeal of Sunbelt Grain, supra, the District Court described the lender's conduct as, at most, "a sharp business practice," but held that this was not a sufficient basis to equitably subordinate a claim. 427 B.R. at 909.
[74] Dkt. 200, 235 (No. 09-10706) and Noteholder Order at pp. 7-8, n. 25, Dkt. 332 (No. 09-10706).